## No. 13,676.

### CITY AND COUNTY OF DENVER *v.* TALARICO.
(61 P. [2d] 1)

Decided September 14, 1936.

Mr. James D. Parriott, Mr. Teller Ammons, Mr. Frederick P. Cranston, Mr. Robert J. Kirschwing, Mr. Frank L. Hays, for plaintiff in error.

Mr. Ronald V. Yegge, for defendant in error.

*In Department.*

Mr. Justice Young delivered the opinion of the court.

The parties to this action will be herein designated as plaintiff and the city or defendant, as they appeared in the district court. Plaintiff secured a verdict of $9,000 for damages to a crop of celery and the ground on which it grew, alleged to have been caused by defendant's negligence in excavating above and along a five foot pipe running to the South Platte river through a dyke, thus allowing flood waters coming down the river while the excavation was open to overflow plaintiff's land. Judgment was entered on the verdict. The city seeks a reversal

for alleged errors of law, and also attacks the validity of the verdict, contending that it is a quotient verdict.

Assuming, as we must, that the jury found as true the testimony tending to support the verdict, we shall briefly review the pertinent facts of the case which are as follows:

September 9, 1933, plaintiff was the owner of a rectangular tract of land, in area approximately thirty acres, bounded on the south by 52nd avenue, which is the boundary line between the City and County of Denver and Adams county, and on the east by Franklin street. When plaintiff purchased this land he constructed a dyke approximately eight feet high along its southerly boundary to protect it from flood waters of the South Platte river. Pursuant to sections 8974 and 8977, Compiled Laws of 1921, authorizing and empowering, but not directing, the city council of the City and County of Denver, to "improve, change, straighten, widen, narrow, deepen, or extend the channel of the South Platte River within the city and county of Denver," the city had erected a dyke along the northwesterly bank of the river, which at this point flows in a general northeasterly direction. The dyke so constructed intersected the dyke erected by plaintiff at a point approximately 250 feet west of the southeasterly corner of plaintiff's property and cutting off about one-half acre of land. Plaintiff's dyke and the city's dyke, converging at an acute angle, form a reservoir. To drain this reservoir into the South Platte river the city intersected its dyke with a sixty inch galvanized iron pipe at a point approximately one hundred feet from the vertex of the angle formed by the two dykes. Having completed storm sewers to carry away the waters which formerly had accumulated in the reservoir, the city determined upon the removal of the sixty inch pipe and the substitution therefor of a smaller pipe containing a valve which would prevent flood-waters passing down the river from flowing back into the reservoir. During the forenoon of September 9, 1933, two men, and in the afternoon four

men, were engaged in taking out this pipe. There is a conflict in the evidence as to whether the necessary excavation was made the full length of the pipe or whether the face of the dyke was left intact, but there was ample testimony to support a jury finding that it extended through the entire width of the embankment.

The work of excavation was commenced Saturday morning, the men ceasing work at 4:30 in the afternoon with the intention of returning and completing it the following Monday. During the intervening night a flood, with a peak flow of 22,000 second feet, came down the South Platte river. The city maintained a bridge across the stream on Franklin street and immediately below and paralleling this bridge was a shorter one, maintained by the Denver and Salt Lake Railroad Company herein referred to as the Moffat company. The evidence shows that the city bridge had sufficient clearance to permit the flood water to pass, while only about one-third of the maximum flood could be carried under the Moffat company bridge. The evidence further discloses, and the defendant in its answer admits, that during the early morning of the 10th of September large quantities of water came down the South Platte river and passed through the opening excavated and left by the defendant; also there was evidence on the part of the city that the Moffat bridge, while it stood, acted as a dam.

The city's defenses were a denial of negligence; a plea that the plaintiff was guilty of contributory negligence in not filling in the excavation left by the city; that the flood was of such unprecedented magnitude as to constitute an act of God; that the plaintiff's damage was caused by the negligence of the Moffat company maintaining a bridge which obstructed the flow of water in the channel or that such negligence concurring with an act of God was the proximate cause of the injury; and that the city in removing the pipe was acting in its governmental capacity and therefore was not liable for damages.

There was testimony that the Moffat company bridge

was washed away before any water ran over the embankment or through the excavation and flooded plaintiff's land. If the jury believed this testimony, which as the triers of fact it had the right to do, then the damming effect of the Moffat company bridge may be eliminated from consideration, the bridge having been removed before the flooding of plaintiff's premises began. The evidence also shows that on the 3rd of August preceding, a flood, with a peak flow of 16,000 second feet, caused by the breaking of the Castlewood dam had passed down the river, and that this flood washed out the Moffat company bridge. These flood waters were not measured at the city bridge but at some distance above in the channel as they passed through the city of Denver. Witnesses who saw both floods testified that the August 3rd flood caused a higher rise in the waters along the banks of the South Platte river at the point where the pipe was located than did the flood of September 9th. On the city's theory that the river channel under the Moffat bridge was insufficient to carry in excess of between 6,000 and 7,000 second feet, and that the bridge formed a dam, the jury may have found that the flood waters rose to a higher stage during the August 3rd flood because the peak volume of such waters would depend on the length of time the bridge held and partially impounded them. The plaintiff's lands were not flooded or damaged by the first flood. The only difference in conditions with respect to the situation existing at the time of the second flood and that of the first, was that the excavation had been made for the removal of the drain pipe.

Engineers for the city testified that the channel between the city dykes, but for the damming effect of the Moffat company railroad bridge, was large enough to convey the peak flow of the September 9th flood, and that at the Franklin street bridge it likewise was sufficient to carry it. It is clear from the evidence, that at no other point in the city of Denver did the channel overflow. It also is clear that on August 3rd, no excavation having at

that time been made, that the Moffat company bridge caused the water to raise to a higher point than on the subsequent date and that there was no overflow. Plaintiff's brother testified that he saw water coming through the excavation and "that it was cutting fast." In this state of the record we think there was evidence from which the jury might properly find that the excavation was the proximate cause of the waters going through the dyke and flooding plaintiff's land.

There being evidence that the excavation was the proximate cause of the damage, was the city negligent in making and leaving it open under the following circumstances disclosed by the record? It appears from the testimony of defendant's witnesses that two men in the forenoon and four in the afternoon had completed about half the excavating necessary for the removal of the pipe; that the plan was to pull out the pipe with a dragline attached to a steam shovel; that on this afternoon the steam shovel was located on Franklin street about 300 feet away; that the operator of the shovel was told by his foreman not to pull the pipe that afternoon. It appears from the testimony of a witness for the city, introduced in support of its defense of contributory negligence on the part of defendant in not filling the excavation, that two men in two hours could have shovelled the dirt back that had been removed from around the pipe. Evidence for the plaintiff was to the effect that when the pipe was removed, and replaced after the flood, the work was completed in about 3½ hours. In other words, it is clear that the removal and replacement of the pipe was a minor matter of maintenance or change, and that with a slightly larger crew the work could have been performed within a few hours. It further appears from testimony of the city's engineers that there are at least seven or eight major water sheds above this point on the South Platte river. It is a well known fact that in mountainous areas floods come suddenly and that the runoff is rapid. While it is unusual, nevertheless it was established as a fact that

all of the water sheds were discharging, and produced this particular flood in the South Platte river. The city contends that the plaintiff was guilty of contributory negligence in not shovelling back the excavated earth which two men might have done in two hours. The jury may well have believed that if that was possible, then the city was not exercising reasonable care—with a crew present which could have quickly refilled it—in leaving the excavation open for any period of time, particularly with seven or eight water sheds above, and a bridge below acting as a dam, which latter the city engineer testified was a menace that the city had been unable to have removed. Reasonable men might well find from the facts and surrounding circumstances, that the city did not exercise reasonable care, and this being true we hold that the verdict and judgment, insofar as the issue of negligence is concerned, is supported by the evidence.

 The defendant assigns as error the failure of the trial court to give an instruction to the effect that it was the duty of plaintiff to refill the excavation after being warned of the flood. The record does not disclose that plaintiff knew of the flood in time to do so. He testified that he was awakened between eleven and twelve o'clock on the night of the flood, by his brother; that he was in town during the day and there is no evidence that he knew of the excavation having been made. Under these circumstances it was not error to refuse to give the instruction on contributory negligence because there was no support for it in the evidence. "A person is not required to regulate his conduct with reference to facts of which he is justifiably ignorant. In order that one may be guilty of contributory negligence, it is essential that he act or fail to act with knowledge and appreciation, actual or imputed, of the danger of injury which his conduct involves." 45 C. J. 946.

 The defendant contends that the flood was unprecedented, and that it constituted in law an act of God. In other words, a happening that in the exercise of ordinary

care the city could not be expected to foresee and provide against. The city engineers testified that the channel of the South Platte, as improved by the city, was sufficient in capacity to carry, and did carry, the flood water except at the point where it was dammed by the Moffat company bridge and that but for such obstruction it would have conveyed it without any overflow. The city had provided protection against floods as large as the one here involved; constructed dykes admittedly sufficient to prevent overflow under natural conditions, and we cannot suppose that they were so constructed unless the city anticipated that dykes of that height were reasonably necessary to care for floods that might occur. We have indicated that there was evidence to show that the excavation was the proximate cause of the flooding of plaintiff's lands, and that but for such excavation it would not have occurred. In setting up the defense of an act of God the defendant simply pleads that nothing it did caused the damage; that it proximately was caused by an act over which it had no control and in the exercise of ordinary care could not foresee. Having expended large amounts of money, pursuant to a policy of confining the water of the river to its channel, in erecting embankments that are sufficient, if kept intact, to carry 22,000 second feet flow, even though that is a larger amount than has been known to flow down the river, we think that it is the duty of the city, not to use ordinary care in refraining from cutting the embankment below the level of the maximum flood stage known to have occurred, but to use ordinary care not to impair the efficiency of the works as constructed. Failing to do the latter it cannot escape liability by imputing the proximate cause of the damage to an act of God.

We think the defense that the city was exercising a governmental function is not sound. In determining its policy, and the character of the construction work to be done under legislative authority to improve the channel of the South Platte river, the city acted in its governmental capacity. The power so to act is by C. L. section

8974 expressly conferred upon the city council. This authority it could not delegate. The actual work of erecting the embankments might be done by men employed by it for that purpose or it might have been done by contract. Similarly it might maintain, repair or alter the dykes when constructed. In the case before us the work was done by the direct employment of men, and we think such work was ministerial in character. The governmental policy of improving the channel and the character and extent of the improvements had been agreed upon and completed. The work was but incidental to the maintenance in an effective condition of an existing utility of the city. In doing ministerial work the city is liable for its negligence. *McCord v. Pueblo,* 5 Colo. App. 48, 36 Pac. 1109; *City of Denver v. Rhodes,* 9 Colo. 554, 13 Pac. 729; *City of Denver v. Davis,* 37 Colo. 370, 86 Pac. 1027; *City and County of Denver v. Mason,* 88 Colo. 294, 295 Pac. 788.

The remaining attack on the judgment is based on the alleged misconduct of the jury in returning a quotient verdict. Section 237 of the Code of Civil Procedure, C. L. 1921, p. 148, provides: "The * * * judgment of the court * * * may be vacated, and a new trial granted * * * for any of the following causes, materially affecting the rights of said party; * * * Second: Misconduct of the jury, and when any one or more of the jurors shall have been induced to assent to any general or special verdict, or to a finding on any question or questions submitted to them by the court, by a resort to the determination of chance, such misconduct may be proved by the affidavits of one or more of the jurors." The leading case in Colorado on this question is *Colorado Springs v. Duff,* 15 Colo. App. 437, 62 Pac. 959. In the opinion the court said: "The appeal is wholly based on what are alleged to have been irregularities on the part of the jury in arriving at a verdict. The motion is supported by the affidavits of two jurors who substantially testified that the jurymen marked on slips the amount of the verdict which they

thought the plaintiff ought to get, and agreed that they would put these slips in a hat, divide the sum total of the result by six, and that the quotient should be the verdict. Of course if this was true the verdict would necessarily be vitiated by this misconduct. Not only are the authorities uniform on the question, but the appellate courts of this state have decided the same proposition. They nearly all agree, however, as do our own cases, that where there is no antecedent agreement, or if after the slips are put in the hat, the sums added and the quotient ascertained, the jury proceed to discuss and consider the propriety of the rendition of a verdict for an amount equal to the quotient, then the verdict will be good. In other words, the principle on which the cases proceed is that where the matter of the verdict is left wholly to chance, it cannot be permitted to stand. Wherever the suit is for unliquidated damages and the jury find great difficulty in arriving at a conclusion and they resort to this scheme to get at a result, and they do not antecedently agree, or if they do agree, they subsequently discuss the question, and the court can see that the verdict is really the result of deliberation and discussion, the verdict will be upheld.''

It will be observed that the code provision contemplates the determination of a fact, namely, whether the verdict is a quotient verdict. The trial court had before it the testimony of two jurors given in open court and affidavits of four others. In ruling upon the motion for a new trial the court said: ''The defendant made an argument upon three propositions of law raised by its motion for new trial. We will take them up in the order in which the defendant has presented them.

''The first is that the verdict is a quotient verdict. We think that the testimony of the jurors given by affidavit and also upon the witness stand was to the effect that after some discussion of the case they added up all of the different amounts proposed as a verdict by individual jurors and divided by twelve and arrived at a certain

figure. Thereafter, however, the whole matter was discussed, and it was agreed that this sum was a reasonable and correct allowance of the damages to the plaintiff, and it does not appear that there was a previous agreement among the jurors to render a verdict by a quotient obtained as above set forth. Under the decisions of the Supreme Court of Colorado we are of the opinion that this was not what is termed a quotient verdict or a verdict by chance, as defined in the Colorado Code.''

The testimony of the two jurors, relied on by defendants to show a quotient verdict was given in open court. The court saw and heard them. Their testimony is reasonably susceptible of the construction placed on it by the court in ruling on the motion for a new trial and under the settled rule in this jurisdiction we cannot disturb the holding.

Judgment affirmed.

MR. JUSTICE BURKE, sitting for MR. CHIEF JUSTICE CAMPBELL, and MR. JUSTICE HOLLAND concur.